UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| RODNEY JOHNSON and DEBORAH JOHNSON, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 4:21-cv-04051-SLD-JEH |
| CITY OF KEWANEE, | ) ) ) |
| Defendant. | ) |

ORDER

Before the Court is Defendant City of Kewanee's Motion for Summary Judgment, ECF No. 25. For the following reasons, the motion is DENIED.

**BACKGROUND**[1]

Plaintiffs Deborah and Rodney Johnson,[2] a married couple, are former employees of the City of Kewanee ("the City"). At the time their employment ended, Deborah was the Account and Finance Director and Rodney was the Public Works Operations Manager. On September 4, 2020,[3] the Johnsons gave written notice to City Manager Gary Bradley that they would be retiring from the City. The Johnsons anticipated that their last day working at City Hall would

---

[1] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Unless otherwise noted, the factual background of this case is drawn from the City's statement of undisputed material facts, Mem. Supp. Mot. Summ. J. 1–10, ECF No. 26; the Johnsons' statements of disputed material facts and additional material facts, Resp. & Objs. Mot. Summ. J. 3–24, ECF No. 27; the City's reply to the Johnsons' additional material facts, Reply 1–20, ECF No. 29; and exhibits to the filings.
[2] Because the Johnsons share the same last name, the Court will refer to them by their first names, "Deborah" and "Rodney," when necessary to distinguish between the two.
[3] The date on which the Johnsons gave their notices of intent to retire differs amongst the parties' filings but is unimportant for purposes of resolving this summary judgment motion. *Compare* Mem. Supp. Mot. Summ. J. ¶ 8 ("On September 4, 2020, Plaintiffs announced they would be retiring from the City . . ."), *with* Resp. & Objs. Mot. Summ. J. ¶ 71 ("On September 2, 2020 Deborah Johnson presented Manager Bradley with her notice of intent to retire.").

1

be October 9, 2020 and that they would then use their earned leave until their official retirement date of January 4, 2021.

Around September 18, 2020, City Clerk Rabecka Jones informed Bradley that Deborah may have taken or copied information from a city computer. On the morning of September 25, 2020, Mayor Gary Moore and Bradley met with the Johnsons, informed them that the City decided to send them home early, and requested that they collect their personal belongings and leave City Hall.

Bradley contacted Chief of Police Troy Ainley and requested that Ainley stand by while the Johnsons collected their belongings and escort them out of City Hall to ensure "that [the Johnsons'] departure from the building was not too much of a scene." Bradley Dep. 39:10–23, Mem. Supp. Mot. Summ. J. Ex. G, ECF No. 26-7. Deborah removed a flash drive from her computer and took it with her when she left her City Hall office.

Shortly after the Johnsons left City Hall, Jones logged onto Deborah's desktop to "double check that everything was on her computer." Jones Dep. 21:16–21, Mem. Supp. Mot. Summ. J. Ex. F, ECF No. 26-6. Jones looked for certain files on Deborah's computer, but saw no files on Deborah's desktop or personal drive. Detective Michael Minx of the Kewanee Police Department also looked at Deborah's computer and did not see any files on the computer. "Somehow in the conversation [between Jones and Minx, it] came up" that Deborah had removed something from her computer when she left. Minx Dep. 13:24–14:2, Mem. Supp. Mot. Summ. J. Ex. H, ECF No. 26-8. The City brought in an outside information technology specialist, Damian Paxton, to review the external drive logs on Deborah's computer.

Later on September 25, 2020, Ainley went to the Johnsons' home to request that they return all City property. That evening, Deborah dropped off a flash drive at the Kewanee police

station.  The flash drive Deborah dropped off that evening was not the same one that she had removed from her City Hall computer that morning.

On September 29, 2020, Deborah brought a 128 GB flash drive to the police station.  That same day Rodney brought two flash drives, a red Brownline 2020 ledger, and a Canon Powershot digital camera with a battery charger to the police station.  The data contained among the different flash drives that were delivered to the police station by the Johnsons consisted of approximately 55,000 files and included personally identifiable information (*e.g.*, social security numbers, bank account numbers, etc.) of City residents and employees.  *See, e.g.*, Deborah Dep. Exs. 3–5, Mem. Supp. Mot. Summ. J. Ex. C, ECF No. 26-3.

On October 9, 2020, Sergeant Nicholas Welgat and Paxton went to the Johnsons' residence to take a statement from Deborah and Rodney.  Paxton inspected the Johnsons' personal electronic devices to determine if there were any City files or records on the devices.

On December 31, 2020, Bradley hand-delivered termination letters to the Johnsons at their home.  Both Deborah's and Rodney's letters stated the following: "As a result solely of your serious misconduct, intentional actions to deprive the City of its property, disrupt operations, and malfeasance in the mishandling/theft of data, your employment with the City is hereby terminated effective immediately."  Deborah Termination Letter 2, Deborah Dep. Ex. 2; Rodney Termination Letter 2, Rodney Dep. Ex. 8, Mem. Supp. Mot. Summ. J. Ex. D, ECF No. 26-4.

On March 22, 2021, the Johnsons filed a complaint against the City alleging that the City failed to provide notice of health insurance continuation coverage as required by the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1166(a)(4)(A).

Compl. ¶¶ 18–19, ECF No. 1.[4]  The City filed its answer and affirmative defenses on June 11, 2021, in which it denied it had an obligation to comply with COBRA notice requirements, denied that it failed to comply with COBRA notice requirements, and asserted that the Johnsons' claims were barred due to their termination for gross misconduct.[5]  Answer 7–9, ECF No. 10. The City filed its motion for summary judgment, ECF No. 25, on August 11, 2023.  The Johnsons filed a response opposing summary judgment, ECF No. 27, on August 30, 2023, and the City filed its reply, ECF No. 29, on September 13, 2023.

## DISCUSSION

### I. Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "[T]he [nonmovant], to survive the [movant's] motion, need only present evidence from which a jury might return a verdict in his favor.  If he does so, there is a genuine issue of fact that requires a trial." *Id.* at 257.  The disputed facts must be material, meaning that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, No. 4:08-CV-69-WCL-APR, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010).

---

[4] The complaint lists two counts: (1) COBRA notice violation, and (2) Damages.  *See* Compl. ¶¶ 18–26.  The parties agree that this amounts to a single cause of action.  *See* Resp. & Objs. Mot. Summ. J. 3.
[5] In addition to its "gross misconduct" defense, the City asserted the affirmative defense of qualified immunity. Answer 9.  The Court declines to address this defense because (1) the City did not raise the issue in its motion for summary judgment, and (2) it is well established that municipalities do not enjoy qualified immunity, *Owen v. City of Independence*, 445 U.S. 622, 638 (1980) ("[A] municipality may not assert the good faith of its officers or agents as a defense to liability. . . ."); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (noting that qualified immunity is unavailable in a suit against a municipality).

The court is to "constru[e] the record in the light most favorable to the nonmovant," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the nonmovant]," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The nonmovant is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Id.* (quotation marks omitted).

## II.    Analysis

COBRA amended both the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, which applies to private employers, and the Public Health Service Act ("PHSA"), 42 U.S.C. §§ 300bb-1–300bb-8, which applies to state and local government employers. "Title XXII of the [PHSA], 42 U.S.C. §§ 300bb-1 through 300bb-8, applies COBRA requirements to group health plans that are sponsored by state or local government employers." Centers for Medicare & Medicaid Services (CMS), *COBRA Continuation Coverage Questions and Answers*, U.S. Dep't of HHS Guidance Portal (July 8, 2020), https://www.hhs.gov/guidance/document/cobra-continuation-coverage-questions-and-answers. The parties cite to the continuation coverage provisions of ERISA but, because the City is a local government employer, the correct statute governing this case is the PHSA.

Nevertheless, when determining what constitutes "gross misconduct" for COBRA purposes, courts look to cases under both ERISA and the PHSA. *See, e.g.*, *Larsen v. Senate of Pa.*, 955 F. Supp. 1549, 1581 n.32 (M.D. Pa.), *aff'd in part, rev'd in part*, 154 F.3d 82 (3d Cir. 1998) ("'COBRA' . . . is virtually a mirror image of the PHSA only it applies to private employers. . . . Thus, cases interpreting the term 'gross misconduct' under COBRA are

5

appropriately used in interpreting the same term as it is used in the PHSA."). The Court will therefore proceed with its analysis, referring to the PHSA and COBRA interchangeably.

### a. Gross Misconduct Exception to Health Plan Continuation Coverage

Under the PHSA, local and state government group health plans are required to give qualified beneficiaries[6] the option to elect to continue their health coverage when the beneficiary experiences a "qualifying event." 42 U.S.C. § 300bb-1(a). The statute defines "qualifying event" as, *inter alia*, "[t]he termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment." *Id.* § 300bb-3(2). When a qualifying event occurs, the group health plan administrator is required to inform the covered employee and qualified beneficiaries of their rights to continuation coverage. *Id.* § 300bb-6(4)(A).

The City does not contend it is not subject to COBRA. *See* Answer 3 ("6. Kewanee, as a local government, is subject to the requirements of COBRA. ANSWER: The City admits the allegations contained in Paragraph 6."). The City admits that it "affirmatively" did not provide notice to the Johnsons of the availability of continuation coverage, but maintains that it is exempt from the notice requirement because the Johnsons were terminated for "'gross misconduct' in stealing City property." Mem. Supp. Mot. Summ. J. ¶ 53. "On summary judgment, [the City] bear[s] the burden of establishing that there are no substantial genuine issues of material fact [as] to whether [the Johnsons] in fact committed gross misconduct." *Boudreaux v. Rice Palace, Inc.*, 491 F. Supp. 2d 625, 633 (W.D. La. 2007).

The parties dispute certain material facts and the admissibility of certain evidence relevant to the determination of "gross misconduct." At summary judgment, the substance of the

---

[6] When the qualifying event is termination of the covered employee, the term "qualified beneficiary" includes the covered employee. 42 U.S.C. § 300bb-8(3)(B).

evidence must be admissible even if the form of the evidence would not be admissible at trial. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(2) (allowing a party, at the summary judgment stage, to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence" at trial).

### b. Admissibility of the City's Evidence of the Johnsons' Conduct

The crux of the City's claim of gross misconduct is the "taking and deleting" of "over 55,000 City files." *See, e.g.*, Mem. Supp. Mot. Summ. J. ¶¶ 38, 48, 57; *see also* Reply 17 ("[T]he basis for termination is provided in the documents produced."); Aff. Kathleen M. Kunkle Supp. Def.'s Mot. Summ. J. 1–2, Reply Ex. 1, ECF No. 29-1 (explaining that the aforementioned "documents produced" were the 55,000 files that were returned to the City by the Johnsons). The City's version of events is that when Deborah left City Hall on September 25, 2020, she took a "SanDisk Cruzer external flash [d]rive," Mem. Supp. Mot. Summ. J. ¶ 24, containing some unknown number of City files, and then deleted 55,000 files from her personal drive and the City server.[7] Deborah denies this. Deborah Aff. ¶ 25, Resp. & Objs. Mot. Summ. J. Ex. L, ECF No. 27-12 ("I did not delete any confidential or private information, data, or files from the City's computer or its server before or after I left on September 25.").[8]

---

[7] *See* Jones Dep. 23:8–9 ("[W]hen we went to [Deborah's] specific drive, . . . the files were missing."); Welgat Dep. 15:5–10, Mem. Supp. Mot. Summ. J. Ex. I, ECF No. 26-9 ("[T]hat was the main concern from city officials at that time is that all of the sensitive information had been taken off of the server and was now on a private computer or hard drive on an unsecured network that can possibly lead to a data breach."); Moore Dep. 9:7–11, Mem. Supp. Mot. Summ. J. Ex. J, ECF No. 26-10 ("[W]e had in the neighborhood of 55,000 files removed from city hall and . . . those files had been wiped – had been deleted from the server, which negated any access by any City employees at that time."); *id.* at 14:9–15:2 ("Q: . . . [Y]ou . . . testified that files, City files had been deleted from the server. . . . [I]s that something different than the files being deleted from Deborah's computer? . . . THE WITNESS: . . . [T]he files that had been on Deborah Johnson's personal computer that she used in her office were also removed from that server that is in the basement of city hall."); *id.* at 15:12–16 ("[W]hen somebody removes in the neighborhood of 55,000 files from a city-owned computer and server, that is denying access to anyone else that would need that information . . .").

[8] The Johnsons attached two self-authored affidavits to their response in opposition to the City's motion for summary judgment. *See* Deborah Aff.; Rodney Aff., Resp. & Objs. Mot. Summ. J. Ex. M, ECF No. 27-13. The

7

The Johnsons contend that the City's evidence showing the taking and deleting of 55,000 files is hearsay and entirely based on the unsupported claim made by Jones. Mem. Opp. Mot. Summ. J. 6–8, ECF No. 28.⁹ The City avers that the fact that 55,000 files were *returned* by the Johnsons to the police station is sufficient evidence that the 55,000 files were *deleted* from the City server. *See* Reply 22–24; *see also id.* at 21 ("It is undisputed that Plaintiffs took and then returned to the City over 55,000 files . . . . The 55,000 number comes from the files that were returned to the City by Plaintiffs via the multiple drives.").

The Johnsons' hearsay objection is rooted in lack of personal knowledge. *See* Mem. Opp. Mot. Summ. J. 7 (arguing that the witnesses who testified about the files being deleted got their information from Jones but that Jones "had never been on Deborah's computer or drive before," did nothing more in the investigation than "look[] over . . . Paxton's shoulder," and "admitted that she . . . never handled the flash drive returned by Deborah"). A witness may testify to a matter only if the witness has personal knowledge. Fed. R. Evid. 602. "[I]f . . . the witness's testimony purports to describe observed facts but the testimony rests on statements of others, the objection is that the witness lacks firsthand knowledge." 1 *McCormick on Evid.* § 10 (Robert P. Mosteller ed., 8th ed. 2022); *see also Flanagan v. Off. of the Chief Judge of Cir. Ct. of*

---

City objected to these affidavits, characterizing them as "sham" affidavits and requesting that the Court disregard them in their entirety. Reply 1–2. The City contrasts the "additional detail" Deborah provided in her affidavit and the "simple questions" Deborah was asked at her deposition. *Id.* at 2.
    The Court finds the City's argument unpersuasive. Though the City correctly identifies the sham-affidavit rule, it fails to adequately demonstrate why the Court should apply that rule here. "[T]he sham-affidavit rule prohibits a party from submitting an affidavit that *contradicts* the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (emphasis added). The Seventh Circuit has clarified that the sham-affidavit rule "must be applied with caution," *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004), and applied only after the court makes a threshold determination of a "contradiction[] so clear that the only reasonable inference [is] that the affidavit was a sham designed to thwart the purposes of summary judgment," *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). The City has not identified any contradictions that reach this threshold and the Court therefore takes the Johnsons' affidavits into account.
⁹ The Johnsons additionally argue that determination of whether files were deleted from Deborah's computer requires expert forensic evidence pursuant to Federal Rule of Evidence 702. Mem. Opp. Mot. Summ. J. 8–11. Because significant issues of material fact exist, the Court need not decide whether a forensic analysis is necessary at this stage.

*Cook Cnty.*, 893 F.3d 372, 375 (7th Cir. 2018) (finding that plaintiff's testimony about what a coworker told her was inadmissible); *Marine Indus. Constr., LLC v. United States*, 151 Fed. Cl. 349, 361 (Fed. Cl. 2020) ("[A] person who has no knowledge of a fact except what another has told him does not satisfy the requirement of knowledge from observation." (quotation marks omitted)).

The City cites to deposition testimony from Jones, Minx, Welgat, Moore, and Bradley to support its claim that 55,000 files were taken and deleted by the Johnsons, *see* Mem. Supp. Mot. Summ. J. 3–10; Reply 21–24, but none of these witnesses had personal knowledge of what files were missing from Deborah's computer or the City server.

When asked what she was looking for on Deborah's computer, Jones said, "Just numerous files. I don't even think I had a list of specific ones. Just to make sure that a simple glance could show that the documents, the files were still there." Jones Dep. 24:4–7. Jones had never logged into Deborah's computer before—so it is not clear how she could know what files were missing—but when she could not find files on Deborah's computer, she contacted Minx. *Id.* at 23:7–25:11. Jones testified that Minx told Bradley that Minx had been in the server the night before and "all of the files that we were concerned about were still there." *Id.* at 26:5–11. Accordingly, Jones's testimony that files had been deleted is not based on personal knowledge.

In contradiction to Jones's testimony, Minx testified that he did not look at the City server because he did not have access. Minx Dep. 13:12–14. Minx testified that he personally did not see data on Deborah's computer but "assumed that [the] data would be on the [City] server." *Id.* at 11:4–22. But then Minx "was told there was no data on the server" by "either Rabecka [Jones] or Gary [Bradley]." *Id.* at 12:11–21. During his investigation, Minx never "compare[d] any of the files on the external drive [provided by Deborah] to files that were or

9

were not on the City server." *Id.* at 50:16–21.[10] Minx, therefore, also had no personal knowledge of whether and how many files were taken and deleted.

Welgat testified that someone from the police department sent the City's attorney an external hard drive with a copy of "all the data and files the plaintiffs took from the city" and he confirmed that the data included over 55,000 files. Welgat Dep. 17:17–18:11. However, he also testified that it was either Jones or Bradley who told him that this information was taken and deleted from the server, *id.* at 18:16–22, demonstrating that he, too, lacked personal knowledge.

Moore testified that he had reached out to the state's attorney insisting that she file charges against the Johnsons because "[the City] had in the neighborhood of 55,000 files removed from city hall and . . . those files had been wiped – had been deleted from the server, which negated any access by any City employees at that time." Moore Dep. 8:16–9:11, Mem. Supp. Mot. Summ. J. Ex. J, ECF No. 26-10. But in the very next line of his deposition, Moore testified that he was "led to believe" that files had been deleted from the City server by either Jones or Bradley, *id.* 9:7–18, thereby eroding any claim that Moore had personal knowledge.

Bradley himself testified that "[a]t some . . . point [he was] informed that over 55,000 files were taken and then returned to the city by the Johnsons," Bradley Dep. 69:18–22, and that "it would have been [Jones] that discovered that information was missing." Bradley Dep. 67:12–22; *see also id.* at 43:12–18 (testifying that he believed Jones or someone else determined that information had been taken).

None of the City's witnesses had personal knowledge of what or how many files were missing from Deborah's computer or the City server. The only consistent thread throughout the City's evidence regarding the alleged taking and deletion of 55,000 files is that it was either

---

[10] *See also* Minx Dep. 12:22–13:8 (Minx testifying that he didn't know what data was missing); *id.* at 18:16–19:1 (same); *id.* at 14:3–9 (Minx stating that analyzing logs of USBs and external hard drives is "outside [his] expertise").

Jones or Bradley who informed various witnesses that the files had been taken and deleted, but even those witnesses do not have sufficient personal knowledge to competently testify that files were taken and deleted.

At this proverbial "put up or shut up" moment, the City "must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quotation marks omitted). The Court finds that the City has not put forth admissible evidence to show that the only reasonable conclusion is that the Johnsons stole and deleted any files. But even assuming *arguendo* that the City's evidence is admissible and that it would establish that the Johnsons had taken files from the City and deleted them, the Court is unconvinced that the taking and deleting of 55,000 City files necessarily constitutes gross misconduct as a matter of law.

### c. Defining Gross Misconduct

COBRA does not define the term "gross misconduct," so courts often look to federal caselaw and state law for guidance. The ordinary meaning of "gross" is "outrageous, extreme or unconscionable," and determining what constitutes "gross misconduct" demands a case-by-case analysis. *Zickafoose v. UB Servs., Inc.*, 23 F. Supp. 2d 652, 655 (S.D. W. Va. 1998).

Courts have found gross misconduct where an intoxicated employee crashed an employer-provided car, *Collins v. Aggreko, Inc.*, 884 F. Supp. 450, 452, 454 (D. Utah 1995); where an employee called a coworker a racial slur and threw an apple toward her, *Nakisa v. Cont'l Airlines*, No. CIV. A. H–00–090, 2001 WL 1250267, at *3 (S.D. Tex. May 10, 2001); where a supervisor beat his employee to the point that she required five days of hospitalization, *Zickafoose*, 23 F. Supp. 2d at 654, 656; where an employee repeatedly and persistently refused to follow the instructions of his supervisor, *Bryant v. Food Lion Inc.*, 100 F. Supp. 2d 346, 365

(D.S.C. 2000); where an employee threatened to "gut" an employer while reaching for a knife, *Colvin v. Peterson Indus., Inc.*, No. 4:13–CV–1458–VEH, 2015 WL 4067321, at *8 (N.D. Ala. July 2, 2015); and where a professor committed student aid fraud and lied about having a bachelor's degree, *Moore v. Williams Coll.*, 702 F. Supp. 2d 19, 25 (D. Mass. 2010).

In contrast, courts have declined to find gross misconduct where the behavior at issue was inadvertent or sporadic, for example, where a forgetful employee occasionally made mistakes or neglected an employer's instructions. *Nero v. Univ. Hosps. Mgmt. Servs. Org.*, No. 1:04CV1833, 2006 WL 2933957, at *5 (N.D. Ohio Oct. 12, 2006). Likewise, courts have not found gross misconduct where an employee was terminated for "lackluster sales," *Virciglio v. Work Train Staffing LLC*, 674 F. App'x 879, 891 (11th Cir. 2016); or where an employee told a coworker what she had overheard from a private conversation between company executives, *Paris v. F. Korbel & Bros., Inc.*, 751 F. Supp. 834, 836, 838–39 (N.D. Cal. 1990). In general, courts have found that mere "negligence or incompetence" does not constitute gross misconduct. *Mlsna v. Unitel Commc'ns, Inc.* (*Mlsna II*), 91 F.3d 876, 881 (7th Cir. 1996).

Given the similar policy concerns between COBRA and unemployment benefits, some courts have looked to state unemployment law to define "gross misconduct." *See, e.g.*, *Paris*, 751 F. Supp. at 838 (looking to California's unemployment statute for guidance); *Burke v. Am. Stores Emp. Benefit Plan*, 818 F. Supp. 1131, 1135 (1993) (looking to Illinois's unemployment statute). Under Illinois law, an employee is ineligible for unemployment benefits if he is discharged for "misconduct," which is defined as "the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other

12

employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit." 820 ILCS 405/602(A).

The only case the City uses to define "gross misconduct" is *Burke v. American Stores Employee Benefit Plan*. Mem. Supp. Mot. Summ. J. 12–15. In *Burke*, the employee-plaintiff was terminated for gross misconduct by her employer (Jewel Food Stores ("Jewel")) and thereby denied notice of COBRA continuation coverage. *Burke*, 818 F. Supp. at 1133–34. As relevant here, the plaintiff claimed that Jewel violated COBRA by failing to notify her of her eligibility for continuation coverage, so the court had to decide whether her alleged behavior constituted "gross misconduct" within the meaning of COBRA. *Id.* at 1134. The court concluded that the plaintiff's actions, if true, rose to the level of criminal theft, which constituted gross misconduct sufficient to justify denial of COBRA continuation coverage. *Id.* at 1136.

The only remaining inquiry then was whether the plaintiff did indeed engage in such misconduct. The plaintiff in *Burke* handwrote and signed a statement in which she admitted to violating company policy when she knowingly used stolen "Turkey Saver Stamps" to obtain free turkeys from different Jewel stores. *Id.* at 1133. Jewel based its decision to terminate the plaintiff on the plaintiff's "own admissions in her . . . statement and the corroborating . . . statement of [her accomplice]." *Id.* at 1138 (footnote omitted). The plaintiff never asserted that her written statement was factually untrue, nor did she offer a competing version of the facts at the time of her dismissal. *Id.* at 1136, 1138.

The City is correct that criminal theft indisputably constitutes gross misconduct. *Id.* at 1136; *cf. Conery v. Bath Assocs.*, 803 F. Supp. 1388, 1396 (N.D. Ind. 1992) (finding that misappropriating company funds is gross misconduct). Unlike in *Burke*, however, the Johnsons

13

have not admitted to the factual allegations the City lodged against them nor admitted they violated City policy.

Using the Illinois statute's definition of theft, the City argues that the Johnsons committed criminal theft by taking and deleting City data and, accordingly, that they committed gross misconduct. *See* Mem. Supp. Mot. Summ. J. 13–15; 720 ILCS 5/16-1(a) ("A person commits theft when he or she knowingly: (1) Obtains or exerts *unauthorized* control over property of the owner . . . ." (emphasis added)). The Johnsons argue that they did not commit criminal theft. Mem. Opp. Mot. Summ. J. 13–22. They assert that Deborah "was an authorized user of the files that she is accused of stealing," *id.* at 14, and had no intent to permanently deprive the City of any files, *id.* at 18, and that Rodney was an authorized user of any City property he took, *id.* at 22.

The City does not dispute that Deborah was authorized to use and access City files, *see* Reply 18, but contends that "whether an employee is an 'authorized user' has no bearing on whether a theft was committed," *id.* at 26. It argues that "[s]imply because Deborah was authorized to use and access City files does not equate to her being able to steal City files." *Id.* at 18; *see also id.* at 26 (arguing that "[e]mployees of companies who are authorized users may still be found to have stolen company data and files").

Whether Deborah was authorized to access and use the files is clearly relevant—it is an element of the crime of theft. *See* 720 ILCS 5/16-1(a). The genuine dispute appears to be whether Deborah was authorized to access and use the files in the way she is alleged to have done in this case. That is a factual question. At the summary judgment stage, for the Court to "decide which party's version of the facts is more likely true," *Payne*, 337 F.3d at 770, "usurps the role of the factfinder," *Wilson v. Williams*, 997 F.2d 348, 350 (7th Cir. 1993).

14

### d. Rodney Johnson's Independent Conduct

The Court observes that the City often conflates Rodney and Deborah's actions, collapsing the two into a single entity.[11] The antiquated notion that "the husband and wife are one person in law," *Mlsna v. Unitel Commc'ns, Inc.* (*Mlsna I*), 41 F.3d 1124, 1131 n.1 (7th Cir. 1994) (Cudahy, C.J., concurring in part and dissenting in part) (quoting 1 William Blackstone, *Commentaries on the Law of England* 430–33 (1765)), is inapposite, and the City provides no legal basis or admissible evidence that would permit Deborah's actions to be imputed to Rodney. The City's only purported evidence regarding any collusion between Deborah and Rodney in the taking and deleting of City files is speculation by Bradley.

> Q: Well, let's just start with how are you saying he assisted his wife in taking city data, computer data?
> A: May have been a presumption on my part that when they were together in the same room, that they knew what was going on between each other.
> Q: Okay. So you presumed that since they live together, he must have known what she was doing?
> A: That may have been a presumption I had at the time.

Bradley Dep. 54:20–55:6. Bradley's presumptions are insufficient to support the inference that Rodney and Deborah are both responsible for the taking and deleting of 55,000 City files.

The misconduct that the City specifically attributes to Rodney is the removal of "construction flagger's certificates and . . . EPA files." Mem. Supp. Mot. Summ. J. ¶ 49. But the City's only evidence for this assertion is a statement by Jones that does not indisputably establish that Rodney took any certificates or EPA files.

> A: The acting Public Works Director came into my office and wanted to know if I had copies of all the flagger's certificates and any of the EPA files.
> Q: Why did he do that, if you know?

---

[11] For example, in paragraphs 12–25, 27–31, and 35 of its Memorandum of Law in Support of its Motion for Summary Judgment, the City details its discovery that files had been deleted from Deborah's City Hall computer and the ensuing investigation. Notably, the City only references *Deborah* in these paragraphs. In paragraph 38, though, the City inexplicably collapses Deborah and Rodney into a single entity, stating that the "files were taken and deleted by *Plaintiffs*." Mem. Supp. Mot. Summ. J. ¶ 38 (emphasis added).

> A: Because they were missing out of Rodney's office. Every one of Rodney's drawer files were empty. And there should have been documentation in there.

Jones Dep. 42:13–21. Even accepting the "well-established [proposition] that knowledge of an employee or agent is imputed to the corporation or entity principal," Reply 25 (citing *Etshokin v. Texasgulf, Inc.*, 612 F. Supp. 1212, 1218 (N.D. Ill. 1984)), and even assuming Jones had personal knowledge that the certificates and files were missing, the only knowledge that can be imputed to the City is that Jones could not find the EPA files and certificates, not that Rodney stole them. The fact that "the certificates were missing and the City had to take action to cure the problem" does not establish that Rodney committed theft. Reply 25.

### e. The City's Conferral with Counsel

Even if the City were wrong that the Johnsons committed gross misconduct, it made its decision not to provide notice of COBRA continuation coverage after "conferr[ing] with its human resources service provider and legal counsel, both of which told the City that theft constituted 'gross misconduct' for COBRA purposes and no notification was required." Mem. Supp. Mot. Summ. J. 15. The City believes that it "cannot be faulted for relying on legal advice." *Id.* The Johnsons characterize this argument as the City improperly invoking the affirmative defense of "reliance on advice of counsel." Mem. Opp. Mot. Summ. J. 11–13. The City responds that the Johnsons provide "no legal authority whatsoever that conferring with legal counsel and/or a good faith attempt to comply with COBRA requirements is in fact an affirmative defense that must be pleaded or waived." Reply 25–26.

The legislative history of COBRA states that employers are to "operate in good faith compliance with a reasonable interpretation of [COBRA's] substantive rules, notice requirements, etc." *Mlsna I*, 41 F.3d at 1130 (quoting H.R. Rep. No. 99-453 at 563 (1985)). The only cases cited by the City pertaining to good faith efforts, however, address good faith efforts

16

to provide notice to a beneficiary as opposed to good faith efforts to determine if notice is required based on a gross misconduct determination. *See* Mem. Supp. Mot. Summ. J. 12, 15 (citing *Munsamy v. Rittenhouse Senior Living of Indianapolis, LLC*, No. 1:10–cv–294–RLY–TAB, 2012 WL 1035019 (S.D. Ind. Mar. 27, 2012); *Turner v. Adidas Promotional Retail Operations, Inc.*, No. 07 C 2511, 2009 WL 901487 (N.D. Ill. Mar. 31, 2009); *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974 (N.D. Ill. 1998)).

The City confuses a good faith effort to provide notice with a good faith effort to determine if certain behavior constitutes gross misconduct, and it presents no caselaw showing that conferral with counsel about whether someone committed gross misconduct means it cannot be liable for failure to give notice. The Court has found no caselaw supporting the finding that an employer's conferral with counsel regarding a termination decision constitutes good faith compliance with COBRA requirements.[12] The Court therefore declines to consider the City's conferral with counsel as probative of its compliance with COBRA.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment, ECF No. 25, is DENIED. The Final Pretrial Conference is now scheduled for December 13, 2023 at 9:15 a.m. at U.S. Courthouse, 100 N.E. Monroe St., Peoria, IL, 61602 before Chief Judge Sara Darrow. The Proposed Pretrial Order is due by December 6, 2023.

---

[12] When the issue of good faith compliance has been before courts, it is almost always in the context of whether an employer's means of providing notice were reasonable. *See, e.g., Dehner v. Kansas City S. Indus., Inc.*, 713 F. Supp. 1397, 1400 (D. Kan. 1989) (holding that an employer acted in "good faith" when it hand delivered a COBRA notification letter); *Lawrence v. Jackson Mack Sales, Inc.*, 837 F. Supp. 771, 782 (S.D. Miss. 1992) ("Methods of notification which are reasonably calculated to reach the employee or beneficiary are considered to conform to the standard of good faith compliance with the statute."), *aff'd*, 42 F.3d 642 (5th Cir. 1994); *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974, 977 (N.D. Ill. 1998) ( "[T]he issue is not whether the former employee actually received notice; the issue is whether the plan administrator caused the notice to be sent in a good faith manner reasonably calculated to reach the former employee." (quotation marks omitted)); *Marsaglia v. L. Beinhauer & Son, Co.*, 987 F. Supp. 425, 432 (W.D. Pa. 1997) ("[T]he few courts that have considered the matter have determined that a good faith effort that is reasonably calculated to reach the employee satisfies COBRA's notice requirement.").

17

Entered this 21st day of November, 2023.

                                                    s/ Sara Darrow
                                                    SARA DARROW
                                CHIEF UNITED STATES DISTRICT JUDGE